**NOT FOR PUBLICATION**

UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW JERSEY

- - - - - - - - - - - - - - - - - - - - - - - - - - -X
In re:

NORVERGENCE, INC.,                          Chapter 7
                                            Case No. 04-32079 (RG)
            Debtor.
- - - - - - - - - - - - - - - - - - - - - - - - - - -X
DIVERSIFIED AEROSPACE
SERVICES, LLC, et al.,
                                            Adversary Proceeding
            Plaintiffs,                     Case No. 04-2862 (RTL)
v.

IFC CREDIT CORP., et al.,

            Defendants.
- - - - - - - - - - - - - - - - - - - - - - - - - - -X

## OPINION

**APPEARANCES:**

Steven D. Cundra, Esq.
Hall, Estill, Hardwick, Gable, Golden & Nelson
(Attorneys for the Plaintiffs)

Andrew J. Kelly, Esq.
Kelly & Brennan, P.C.
(Local Attorneys for the Plaintiffs)

Linda Gates, Esq.
Platzer, Swergold, Karlin, Levine, Goldberg & Jaslow, LLP
(Attorneys for Defendant, IFC Credit Corp.)

**RAYMOND T. LYONS, U.S.B.J.**

## INTRODUCTION

This case involves two non-debtor parties litigating issues stemming from their dealings

with the Debtor in this bankruptcy case. The Plaintiffs are consumers who purchased telecommunication services from the Debtor, while the Defendant, IFC Credit Corp., is a financing company that was assigned and took as security Debtor's agreements with consumers in return for infusing the Debtor with capital. When the Debtor's faulty services and disingenuous business practices became evident, its business began to unravel. This eventually lead the Debtor into an involuntary bankruptcy. When Plaintiffs refused to continue paying for services that did not work or that they were no longer receiving, the Defendant sought to enforce the Plaintiffs' contractual obligations. Plaintiffs eventually filed suit in the bankruptcy court to have their agreements found void and unenforceable. Plaintiffs have moved for summary judgment. In response, IFC opposed the motion and cross moved to dismiss.

This court finds it does not have jurisdiction under 28 U.S.C. § 1334(b) because the current case is not arising under, arising in, or related to the Debtor's case under title 11. Since there is no basis for federal jurisdiction, this proceeding must be dismissed.

## **FINDINGS OF FACT AND PROCEDURAL HISTORY**

Beginning in 2002, NorVergence, Inc., the Debtor in this case, was engaged in the business of reselling telecommunication services purchased from common carriers.[1] The Debtor typically sold these services to small businesses, non-profit organizations, churches, and municipalities. The Debtor used account representatives to make contact with consumers and marketed its services as integrated, long-term packages that bundled landlines, cellular telephone services, and internet access in order to provide telecommunications services at a discounted

---

[1] The basic facts in this case are not in dispute. Factual information included here was compiled from the case's docket and the briefs submitted by the parties.

price. The Debtor's representatives told consumers that the ability to obtain discounted phone services depended on the rental of a high-tech piece of equipment called the Matrix. The Matrix was part of the complete bundled unified telecommunication services agreement and was said to create the promised substantial savings in the total cost of each consumer's service.

Consumers typically signed applications and agreements for a five-year period for a total price equal to the promised monthly payments over five years. The total cost to consumers was $7,000 to $340,000, with an average cost of $29,291. These agreements included an Equipment Rental Agreement ("ERA"), signed on behalf of each consumer, for the Matrix. Most of the payments under the agreements were allocated to the rental of the Matrix, which was, in actuality, either a common router or firewall that cost between $200 and $1,500. Each plaintiff later discovered that the equipment did not provide any of the heavily discounted telecommunications services as represented by the Debtor, and in fact, did not work at all.

Once the Debtor obtained signed rental agreements for the Matrix from its customers, it assigned the agreements to finance companies.[2] On October 10, 2003, the Debtor assigned ERAs to IFC Credit Corp., the defendant in this case, under a Master Program Agreement. This master agreement was later amended on two separate occasions.[3] Under this agreement, the Debtor assigned the ERAs in exchange for IFC's investment in Debtor's working capital. The

---

[2] IFC is a finance company engaged in the business of originating finance leases with its customers and purchasing leases by assignment from either venders or other leasing companies. Its primary place of business is in Illinois.

[3] The first amendment, on March 16, 2004, sought to further limit IFC's financial losses due to the increasing customer defaults caused by the Debtor's failure to deliver the promised services. In May 2004, a second amendment was made that provided for a "hold back" by IFC of an additional 25% of funding liabilities to the Debtor for all ERAs funded by IFC after April 26, 2004.

agreement further provided that performance under the ERAs was not contingent on Debtor's performance under the consumers' telecommunication service agreements. The Debtor was also required to repurchase the assigned leases if a customer defaulted in making its first payment due under the lease and such default was not cured within thirty days.

Because of a number of breaches on the part of the Debtor, it was required to repurchase leases. Rather than demanding repurchase, IFC agreed to transfer the leases back to the Debtor and accept a security interest in the ERAs as collateral for the future payment of the repurchase price. In order to effectuate this transaction, the Debtor and IFC entered into two security agreements on June 16, 2004. Under these agreements, IFC acquired a security interest in 256 ERAs held by the Debtor, valued at over $15 million. On June 25, 2004, IFC filed UCC-1 financing statements in an effort to perfect these security interests.

On June 30, 2004, an involuntary chapter 11 bankruptcy petition was filed against the Debtor. The case was later converted to chapter 7 on July 14, 2004. IFC eventually filed a proof of claim in the Debtor's bankruptcy case, on February 28, 2005, for an unsecured, nonpriority claim in the amount of $15,368,827.75 for its expected losses on the assigned rental agreements.

When consumers refused to continue paying for faulty or non-existent services, IFC filed collection suits against each of the consumers and individual guarantors in various state and federal courts in Illinois between August 31, 2004 and October 13, 2004. Each of the lawsuits represented that the consumers owed the alleged accelerated balances due on their ERAs regardless of whether the Debtor provided the promised telecommunications services.

On November 1, 2004, twenty-six plaintiffs ("Original Plaintiffs") whose ERAs were held by the Debtor and collateral to IFC's security interests instituted an adversary proceeding

against IFC, the Trustee, and Access Integrated Technologies, Inc.[4]  The proceeding sought a declaratory judgment that the equipment leases between the Debtor and consumer-plaintiffs were void and unenforceable as a matter of law.  The complaint also sought injunctive relief against the Defendants from enforcing the equipment leases with the Original Plaintiffs.

On April 21, 2005, IFC and the Original Plaintiffs entered into a written settlement agreement under which IFC agreed to terminate its interest in the collateral ERAs in addition to terminating the June 25, 2004 financing statement.  In return, the Original Plaintiffs' amended complaint was dismissed with prejudice.  This agreement was approved by the court on May 31, 2005.[5]  On June 7, 2005, a docket entry was entered reflecting that IFC's involvement was "terminated" as a result of the settlement.

However, during the May 9, 2005 status conference, the court permitted a second amendment to the adversary complaint to be filed that included eleven additional plaintiffs ("Moving Plaintiffs").  These Moving Plaintiffs were the customers whose ERAs were assigned to IFC.

These new plaintiffs moved for summary judgment.  On March 25, 2008, this proceeding was transferred and reassigned to this judge.  The Defendant asked the court to address jurisdiction before other arguments, and the court agreed.  The court requested the Plaintiffs' lawyer to advise the court regarding the status of the Trustee's administration and the potential

---

[4] This proceeding is one of many similar proceedings involving the Debtor's customer-plaintiffs and its financial institution-assignee-defendants of the ERAs.

[5] One of other defendant in this case, Access Integrated Techonologies, Inc., also settled with these plaintiffs.  An order approving this settlement was entered by the court on January 12, 2006.

impact of this adversary proceeding on the estate. In a letter dated April 9, 2008, Plaintiffs' attorney informed the court that: "[The Trustee's attorney] advised me that he did not believe the outcome of the pending adversary proceeding would have any impact on the estate. . . . [T]he case at present is administratively insolvent . . . ." Correspondence re: Letter to Judge Lyons providing him with a status of the case, Docket No. 04-2862, Doc. 59, Apr. 9, 2008.

## DISCUSSION

Before the court can address the substantive issues raised by the parties, it is necessary to determine whether the bankruptcy court has jurisdiction over this proceeding. Bankruptcy courts are courts of limited jurisdiction that "fall outside the constitutional authority of Article III and derive their authority from federal statutes." *Binder v. Price Waterhouse & Co., LLP (In re Resorts Int'l, Inc.)*, 372 F.3d 154, 161 (3d Cir. 2004). 28 U.S.C. § 1334, along with 28 U.S.C. § 157, is the source by which the federal bankruptcy court obtains jurisdiction. Section 1334(b) provides that "the district court shall have original but not exclusive jurisdiction of all civil proceedings arising under title 11, or arising in or related to cases under title 11." 28 U.S.C. § 1334(b).[6] While § 1334 works in conjunction with 28 U.S.C. § 157 in order to determine the

---

[6] The relationship between 11 U.S.C. § 1334 and the jurisdiction of the bankruptcy court is explained in detail in *Collier on Bankruptcy*:
> Subsections 1334(a), (b) and (e) of title 28, United States Code, establish the jurisdiction of the federal district courts over title 11 cases, civil proceedings in title 11 cases and property of the title 11 estate, respectively. This jurisdiction is original and exclusive as to the title 11 case itself and property of the estate, while district court jurisdiction over civil proceedings is original but not exclusive. Consequently, while bankruptcy cases themselves can be maintained only in the district courts, civil proceedings that occur during a bankruptcy case may, under certain circumstances, be heard either in federal or state court.
>
> Having thus established initial jurisdiction in the district courts, a structure necessitated, as shall be seen, by constitutional considerations,

specific proceedings over which the bankruptcy court may sit, the first step in the analysis is to determine whether claims fall within the grant of jurisdiction in § 1334.[7]

The burden of proof for establishing subject matter jurisdiction falls on the plaintiff.  *See Mortensen v. First Fed. Sav. & Loan Ass'n*, 549 F.2d 884, 891 (3d Cir. 1977); *Cohen v. Kurtzman*, 45 F. Supp. 2d 423, 429 (D.N.J. 1999).  The key to the jurisdictional analysis under § 1334 is determining whether the claims at issue arise under, arise in, or are related to title 11.

Proceeding arising under or arising in title 11 must substantively invoke title 11 or have no existence independent of the bankruptcy case. *See Stoe v. Flaherty*, 436 F.3d 209, 216 (3d Cir. 2006).  A proceeding is related to a case under title 11 "if 'the outcome of that proceeding could *conceivably* have an effect on the estate being administered in bankruptcy.' " *Id.* at 217 (quoting *Pacor Inc. v. Higgins (In re Pacor)*, 743 F.2d 984, 994 (3d Cir. 1984), *overturned on other grounds* by *Things Remembered, Inc. v. Petrarca*, 516 U.S. 124 (1995)) (emphasis added).  This test is satisfied "if the outcome [of the action] could alter the debtor's rights, liabilities, options, or freedom of action (either positively or negatively) and which in any way impacts

---

> 28 U.S.C. § 157(a) permits the district courts to refer most of that jurisdiction to the bankruptcy courts established by 28 U.S.C. § 151 as units of the district courts. All district courts have availed themselves of this power and have referred the day-to-day administration of title 11 cases and much of the trial responsibility that arises in such cases to the bankruptcy courts.

1 COLLIER ON BANKRUPTCY ¶ 3.01 (Alan N. Resnick & Henry J. Sommer eds., 15th ed. rev. 2008).

[7] 28 U.S.C. § 157 provides the rules for determining core versus non-core proceedings in bankruptcy.  While this section is relevant to the procedures the bankruptcy court must follow when hearing certain types of claims, "§ 157 standing alone does not grant federal subject matter jurisdiction.  Instead, it further categorizes those cases over which the federal court can exercise jurisdiction." *Royal Indem. Co. v. Admiral Ins. Co., Inc.*, no. 07-2048, 2007 U.S. Dist. LEXIS 85991, at *7-8 (D.N.J. Nov. 19, 2007).

upon the handling and administration of the bankrupt estate." *Pacor, Inc.*, 743 F.2d at 994. While broadly defined, such jurisdiction is not without limits. The Third Circuit noted: " 'Jurisdiction over nonbankruptcy controversies with third parties who are otherwise strangers to the civil proceedings and to the parent bankruptcy does not exist.' " *Id.* (quoting *In re Haug*, 19 B.R. 223, 224-25 (Bankr. D. Or. 1982)). "[T]he mere fact that there may be common issues of fact between a civil proceeding and a controversy involving the bankruptcy estate does not establish [related to jurisdiction]." *Id.*

Thus, it may be difficult for a bankruptcy court to find that claims of non-debtor parties have a conceivable effect on the bankruptcy estate. One situation where such difficulties arise is when a proceeding is instituted in bankruptcy court between two non-debtor parties on the basis that jurisdiction exists because the defendant has possible indemnification or contribution claims against a debtor. Courts in this circuit have consistently found the mere possibility of future indemnification from the debtor is not sufficient to satisfy related to jurisdiction. *In re Federal-Mogul Global, Inc.*, 300 F.3d 368, 381-82 (3d Cir. 2002).[8] In *Federal-Mogul*, the Third Circuit

---

[8] *See, e.g., In re Combustion Eng'g, Inc.*, 391 F.3d 190, 227 (3d Cir. 2004) ("Because the potential indemnification and contribution claims against Federal-Mogul had not yet accrued and would require another lawsuit before they could affect Federal-Mogul's bankruptcy estate, we concluded the district court correctly held it lacked subject matter jurisdiction over the third-party friction product claims."); *Pacor, Inc.*, 743 F.2d at 995-96 ("At best, [this action] is a mere precursor to the potential third party claim for indemnification by Pacor against Manville. Yet the outcome of the Higgins-Pacor action would in no way bind Manville, in that it could not determine any rights, liabilities, or course of action of the debtor. . . . There being no federal jurisdiction, the district court had no alternative but to remand the Higgins-Pacor action to state court."). *See also AUSA Life Ins. Co., Inc. v. Citigroup, Inc.*, 293 B.R. 471, 476 (N.D. Iowa 2003) ("The present action is brought by a non-debtor against non-debtors. A recovery by plaintiffs will not directly affect Enron's bankruptcy estate. Even though indemnification and contribution claims against Enron are conceivable in the future, they have not yet accrued . . . . The current action is only a precursor to the potential contribution claim. . . . Speculative, theoretical claims are not sufficient to show "related to" bankruptcy jurisdiction.").

8

explained:

> Therefore, because any indemnification claims that . . . Defendants might have against Debtors have not yet accrued and would require another lawsuit before they could have an impact on Federal-Mogul's bankruptcy proceeding, we cannot hold that the District Court's ruling that it lacked subject-matter jurisdiction because the . . . Claims were not "related to" the Federal-Mogul bankruptcy proceeding was a "clear error . . . approaching the magnitude of an unauthorized exercise of judicial power."

*Id.* at 382 (quoting *Lusardi v. Lechner*, 855 F.2d 1062, 1069 (3d Cir. 1988)). Thus, if a claim for indemnification is not yet matured against a debtor such a claim cannot be said to have a conceivable effect on the bankruptcy estate.

This analysis may differ when contractual indemnification is at issue. "[C]ontractual indemnity claims *can* have an effect on a bankruptcy estate and thus provide a basis for the exercise of 'related to' jurisdiction." *Belcufine v. Aloe*, 112 F.3d 633, 636 (3d Cir. 1997) (emphasis added).[9] At issue in *Belcufine* was an action by former employees against officers of the debtor. *Id.* at 634. The action was based on the non-payment of certain benefits earned pre-petition by the former employees. *Id.* The court found related to jurisdiction was present based on express provisions in the debtor's by-laws that provided contractual indemnification by the

---

[9] *See also Royal Indem. Co.*, 2007 U.S. Dist. LEXIS 85991, at *11-12 ("An indemnification agreement does necessarily give rise to related-to jurisdiction. The question is one of directness-no jurisdiction exists where recovery from the estate through indemnification is contingent on the outcome of a subsequent lawsuit. If the indemnification claim has "matured" and will not require further litigation then it can be the basis of related-to jurisdiction. This determination requires an evaluation of the indemnification agreement itself.") (internal citations omitted); *Steel Workers Pension Trust v. Citigroup, Inc.*, 295 B.R. 747, 751 (Bankr. E.D. Pa. 2003) ("*Belcufine* reiterated *Pacor's* premise that a contractual indemnification provision could, but not necessarily, impact that bankruptcy estate, providing the basis for "related to" jurisdiction.").

9

debtor to its officers.[10]  *Id.* at 636.

      The court finds it does not have jurisdiction over this proceeding.[11]  As discussed above,

---

[10] *Belcufine* was decided in the context of a chapter 11 case.  As the Supreme Court explained in *Celotex Corp. v. Edwards*, 514 U.S. 300 (1995): "[I]t is relevant to note that we are dealing here with a reorganization under Chapter 11, rather than a liquidation under Chapter 7. The jurisdiction of bankruptcy courts may extend more broadly in the former case than in the latter." *Id.* at 310.  This can be understood to mean that when a Debtor's goal is to reorganize, not liquidate, the concept of "claims that could conceivably effect the estate" warrants an even broader construction.  The impact of such claims could have a very real effect on a debtor's ability to effectively function as a reorganized business.  Thus, the result in *Belcufine* might have been different if the court were dealing with a chapter 7 liquidation instead of a chapter 11 reorganization case.

[11] On June 29, 2006, Judge Gamberdella delivered a decision in a separate NorVergence adversary proceeding dealing with a similar jurisdictional issue.  In that decision, Judge Gamberdella found related to jurisdiction existed, stating:
> This Court's related-to jurisdiction will exist only if the determinations of Counts 1 through 7 could alter the Debtor's rights, liabilities, option, or freedom of action.  In reviewing the applicable case law here, in this Court's view, such a situation could arise if the Debtor were contractually obligated to indemnify the Defendants upon a finding of liability in the instant suit.
> . . .
> It is clear that the Debtor estate may be administratively insolvent.  However, it's also clear at this stage of the bankruptcy case itself that it is simply too early, in this Court's view, to determine whether the estate will ultimately prove to be insolvent so to, at this point, cut off consideration of related-to jurisdiction.
> . . .
> Accordingly, the Motions to dismiss the adversary proceedings based on lack of subject matter jurisdiction are denied.

Exhibit F - Transcript of June 29, 2006 Motion Decision, p. 65:18-24, p. 66:9-14, p. 69:10-12, Docket No. 04-2862, Doc. 53-8, Feb. 26, 2007. Judge Gamberdella stated that her opinion was to "apply in equal force to the separate, but similarly-situated adversary proceedings." Exhibit F - Transcript of June 29, 2006 Motion Decision, p. 12:13-14, Docket No. 04-2862, Doc. 53-7, Feb. 26, 2007.
     The Third Circuit has held that "there is no such thing as "the law of the district." " *Threadgill v. Armstrong Cork Co.*, 928 F.2d 1366, 1371 (3d Cir. 1991). The court explained:
> Even where the facts of a prior district court case are, for all practical purposes, the same as those presented to a different district court in the same district, the prior "resolution of those claims does not bar reconsideration by this Court of similar contentions. The doctrine of *stare decisis* does not compel one district court judge to follow the

in order for claims to fall within the jurisdictional grant of § 1334(b), those claims must be arising under, arising in, or related to title 11. The claims in this case are not arising under or arising in title 11. This action is based upon non-bankruptcy, state statutory, and common law principles. Therefore, federal jurisdiction in this case could only arise as a result of the claims in this proceeding being related to the debtor's bankruptcy case.

If the Moving Plaintiffs are successful in this proceeding, IFC will not be able to collect payment from them. Since IFC and the Debtor entered into an indemnification agreement, IFC would have a claim against the Debtor for payment. If it is found that the Debtor must indemnify IFC, the end result would be that IFC would have an increased unsecured claim against the Debtor's bankruptcy estate. The same would be true as to the Original Plaintiffs if

---

decision of another." *State Farm Mutual Automobile Insurance Co. v. Bates*, 542 F. Supp. 807, 816 (N.D. Ga. 1982). Where a second judge believes that a different result may obtain [sic], independent analysis is appropriate. *Id.*

*Id.* at 1371. Citing *Threadgill*, Chief Judge Wizmur found the bankruptcy court is not bound by "decisions of a district court on questions of law . . . ." *In re Brown*, 244 B.R. 62, 64 (Bankr. D.N.J. 2000). It follows that the decision of one bankruptcy judge in a district is not binding on another bankruptcy judge in that same district. Additionally, the Third Circuit noted in *Resorts International*: "[I]f a court lacks jurisdiction over a dispute, it cannot create that jurisdiction by simply stating it has jurisdiction in a confirmation or other order." *Resorts Int'l, Inc.*, 372 F.3d at 161.

Plaintiffs contend that based on the June 29, 2006 decision, this court should follow the "law of the case." "Under the Law of the Case Doctrine, once an issue is decided, it will not be relitigated in the *same case*, except in unusual circumstances." *Waldorf v. Borough of Kenilworth*, 878 F. Supp. 686, 695 (D.N.J. 1995) (emphasis added). The rationale behind this doctrine is to "maintain[] consistency and to avoid the reconsideration of matters once decided during the course of a single continuing lawsuit." *Id.* However, as pointed out by Plaintiffs' brief, the instant matter is not one of the adversary proceedings at issue in the June 2006 decision; therefore, this is not the "same case." Regardless of the similarities between this case and those dealt with in the June 2006 decision, this court is not bound to follow that decision.

Furthermore, things have changed since the issuance of the June 2006 decision. As Judge Gamberdella indicated, at the time of that decision it was too early to tell whether the Debtor's estate would prove to be administratively insolvent. Now, almost two years later, such doubts have been resolved and it is clear that the Debtor is administratively insolvent.

IFC were to seek indemnification from the Debtor for the amounts owed under those agreements.

A verdict in favor of the Moving Plaintiffs will not produce any practical impact on the estate. As Plaintiffs' attorney stated in an April 9, 2008 letter to the court:

> [The Trustee's attorney] advised me that he did not believe the outcome of the pending adversary proceeding would have any impact on the estate. [He] indicated that all of the estate's assets have been liquidated, the case at present is administratively insolvent, and the Trustee is pursuing a separate adversary proceeding on behalf of the estate against certain leasing companies including, but not limited to, IFC Credit Corp.

Correspondence re: Letter to Judge Lyons providing him with a status of the case, Docket No. 04-2862, Doc. 59, Apr. 9, 2008. Given the fact that the estate is administratively insolvent, the argument for jurisdiction based on possible indemnification by the Debtor is unpersuasive. If the estate has no money for general unsecured claims, a determination that the Debtor has to indemnify a defendant in another action will have no effect on the estate since the estate cannot pay any general unsecured creditors.

Furthermore, priority claims exist in the Debtor's case. Proofs of claim were filed by the IRS for more than $99 million in priority claims. Additionally, the initial petition in the case lists claims for wages, salaries, and commissions, 11 U.S.C. § 507(a)(3) (2000), and contributions to employ benefit plans, 11 U.S.C. § 507(a)(5) (2000), as priority claims. For similar reasons, such claims make the indemnification argument even more tenuous.

The Debtor's estate is unable to pay any general unsecured claims in the case, including any unsecured claims that could result from this litigation. This is the result regardless of any prior agreement to indemnify another party. Since such claims cannot be paid, they cannot conceivably have an effect on the bankruptcy estate. Thus, this litigation and the potential unsecured claims that could result are irrelevant to the bankruptcy estate.

**CONCLUSION**

No claims exist in this case to establish the requisite jurisdiction of the bankruptcy court as required under 28 U.S.C. § 1334(b). The argument that IFC could have a claim for indemnification against the Debtor if the Moving Plaintiffs were successful in this litigation is not sufficient to establish that a conceivable effect on the administration of the estate is present. Thus, the Moving Plaintiffs have not met their burden of proving that related to jurisdiction exists. Therefore, since the bankruptcy court is without jurisdiction, this proceeding must be dismissed.


Dated: April 25, 2008                              **/S/Raymond T. Lyons**
                                                   United States Bankruptcy Judge